## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FULTON BANK, N.A., successor to** | : | **CIVIL ACTION** |
| **FULTON FINANCIAL ADVISORS,** | : | |
| **N.A.,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO.  10-1093** |
| | : | |
| **UBS SECURITIES, LLC, et al.,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                          **November 7, 2011**

This case arises out of the collapse of the market for auction rate securities

("ARS").  Fulton Bank, N.A., successor to Fulton Financial Advisors, N.A., is suing the

defendants alleging securities fraud and related state law claims in connection with its

purchase and retention of various ARS in auctions that the defendants managed.  The

defendants have filed a motion to dismiss the complaint in its entirety pursuant to Rule

12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.  For the following

reasons, I will grant Defendant's Motion to Dismiss.

## I.      BACKGROUND[1]

ARS are financial instruments with a long-term maturity that pay interest rates,

which are set and reset by auctions conducted at pre-determined intervals, usually seven,

twenty-eight, or thirty-five days through a "Dutch auction" process.  See Compl. ¶¶ 5, 19.

---

[1] The facts are gleaned from the complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  For the purposes of this motion, they are presented in the light most favorable to the plaintiff, as the non-moving party, and are accepted as true with all reasonable inferences drawn in its favor.

At such an auction, potential investors specify the number of shares they wish to purchase and the lowest interest rate they are willing to accept.  Id. at ¶¶ 5, 19.  Existing ARS holders specify the number of shares they wish to sell, either on an unqualified basis or at a specific interest rate, and the number of shares they wish to continue to hold.  Id.  The bids and offers are conveyed to an auction agent, who ranks each bid and offer according to the interest rate.  Id.  The lowest bid rate at which all shares offered for sale can be sold establishes the interest rate to be paid until the next auction.  Id.  The sale price is set at the par value of the security, usually $25,000, while the interest rate, earned by the buyer until the next auction, is determined by the outcome of the auction.  Id. ¶ 19.

ARS include bond-like investments issued by municipalities and student loan entities, generally known as auction rate certificates ("ARC").[2]  The municipalities, student loan lenders, and other borrowers who issue ARS are collectively known as "issuers."  They receive the proceeds from the original sale of the ARS and assume the obligation to pay principal and interest.  Id. at ¶¶ 5, 15.  The issuer engages one or more "underwriters" to structure, underwrite, and distribute the issue.  The issuer also engages an "auction agent" and an "auction manager."  Auction agents administratively conduct the auctions at which the rates on the ARC are reset.  Id. at ¶¶ 15-16.  The duties of the auction manager, or what the complaint refers to as the "contractual broker-dealer," are specified in a Broker-Dealer Agreement between the auction manager and the issuer, and include soliciting bids for ARS from investors, securities brokers, and financial advisors; submitting offers to purchase or sell ARS; communicating the results of the auction; and

---

[2] ARS also include preferred stock issued by closed-end mutual funds, generally known as "auction preferred shares."  This case, however, involves student loan ARC's backed by pools of student loans.  See Compl. ¶ 5.

facilitating settlement.  Id. at ¶¶ 16, 20.  The auction manager is paid by the issuer for performing these services.  Id. at ¶ 29.

ARS products were first marketed in the 1980's.  Approximately twenty years later, securities firms led a dramatic expansion of ARS markets in the United States.  These debt instruments were marketed as providing benefits to both issuers and investors.  Securities firms earned fees for underwriting ARS, for selling them, and for managing the auctions.  Id. at ¶ 8.  These fees were so lucrative that securities firms became secret "guarantors" of the success of the auctions.  If there was insufficient investor interest in a particular auction, such that there were not enough buyers to match the sellers, then the auction was at risk of failure.  Id.  This threatened the entire market, which was based on investor confidence in access to short-term liquidity on demand.  To protect the broader market from seizing up, and to protect their stream of underwriting fees and auction management fees, securities firms allegedly entered proprietary bids to ensure that the auctions succeeded, thereby creating the illusion of an efficient, completely liquid market.  Id. at ¶¶ 8, 9, 12.

This was the practice until the summer of 2007 when the credit crisis struck and demand for ARS collapsed.  Securities firms allegedly reacted with enormous increases in their proprietary ARS purchases to conceal the fact that the markets had become illusory and were near failing.  Id. at ¶¶ 9, 12, 32-35.  They turned to their retail sales force to bail them out of their ever-increasing exposure to ARS inventory risk, directing account executives to push ARS on customers as hard as possible and increasing commissions and other incentives for success in doing so.  Id. at ¶¶ 9, 95.  These efforts

allegedly succeeded in delaying and concealing the downward spiral of the ARS markets and the skyrocketing ARS inventories held by the securities firms, but the firms were not able to market their way out of the collapse in demand for ARS caused by the credit crisis.  Id. at ¶ 10.  In February and March 2008, the ARS auction markets failed entirely, leaving the securities firms and their customers with over $350 billion in unsaleable ARS. Id.  The plaintiff held and continues to hold more than $300 million of ARC, more than $249 million of which was purchased through the defendants.  Id. at ¶ 11.  All of the illiquid ARC immediately declined in value, typically by more than ten percent, as a result of the lack of marketability and the disclosure of the true level of risk ARC entailed, resulting in hundreds of millions of dollars of damages to customers like the plaintiff.  Id. at ¶¶ 11, 115.

The complaint further alleges that when the ARS auctions began to fail, Defendant UBS Securities increased the frequency with which it placed support bids.  Id. at ¶¶ 53-55.  When most ARS auctions began to fail in February 2008, auctions for the majority of the ARS that the plaintiff held for which Defendant UBS Securities served as auction manager began to fail on a consistent basis, leaving the plaintiff's ARS investments illiquid.  Id. at ¶¶ 68-69.  Many of the plaintiff's ARS issued by municipalities were repurchased at par by the issuers because their maximum rates were above prevailing market rates.  Id. at ¶ 69-70.

Defendant UBS Securities was retained by ARS issuers to manage their auctions, including the auctions for the ARS issues purchased by the plaintiff and at issue here.  Id. at ¶ 11.  Its duties as an auction manager were spelled out in broker-dealer agreements

4

entered into with ARS issuers.  Id. at ¶¶ 16, 20.  Like other auction managers, UBS

Securities sometimes prevented the auctions it managed from failing by placing support

bids.  Id. at ¶ 32.  UBS Securities disclosed to the market that:  (a) it could, but was not

required to, "submit bids for its own account . . . to prevent a failed auction;" (b) it in fact

did place "bids in a large percentage of auctions and believe[d] that a significant number

of auctions would fail if it did not do so;" (c) such support bids "result in a lower reset

rate than otherwise might have occurred;" and (d) UBS Securities' interests in placing

support bids could "pose a potential conflict of interest" with other bidders.  See Def.'s

Exh. 3 at 6.

Defendant UBS Financial Services, an affiliate of UBS Securities, is a broker-

dealer that effects transactions in securities for the accounts of its clients.  Id. at ¶¶ 2, 4.

UBS Financial Services sold ARS to its private wealth-management customers, and there

is no allegation here that it ever sold ARS to the plaintiff.  Id. at ¶¶ 4, 135.

The plaintiff held institutional investment accounts with two broker-dealers, PNC

and NatCity, which served as Fulton's securities brokers.  Id. at ¶¶ 24, 160.  NatCity and

PNC recommended to Fulton that it invest in ARS in order to achieve Fulton's

investment goals of a high degree of safety and liquidity with a modest rate of return.  Id.

at ¶¶ 25-26.  Following PNC and NatCity's recommendations, Fulton purchased the ARS

for which Defendant UBS Securities served as auction manager.  Id. at ¶ 29.

The plaintiff's student loan ARC were not redeemed for the most part, because

their maximum rates were below market rates.  Id. at ¶¶ 69-70.  The plaintiff sold certain

ARC at a discount of 10% or more and continues to hold more than $249 million of ARC

whose auctions were managed by UBS Securities.  Id. at ¶ 115.  After the auction failures of February 2008, several regulators commenced investigations of many financial firms involved with ARS, including the defendants.  Id. at ¶ 99.  The investigation of the defendants focused on their marketing and sales of ARS to clients who purchased ARS directly from the defendants.  Id. at ¶¶ 100, 107(a).  The regulators and the defendants eventually reached settlements in which the defendants essentially agreed to offer to repurchase ARS held by their own clients.  None of the agreements involved the defendants offering to repurchase ARS from other securities firms' clients whose auctions were only managed by the defendants.  Because the plaintiff was a client of PNC and NatCity, the defendants' settlements with regulators did not involve the plaintiff.

On May 31, 2006, following an investigation into certain practices by broker-dealers, underwriters, and auction managers in the ARS market, the SEC issued a consent cease-and-desist order concerning some of the activities that form the basis of this action (the "2006 SEC Order").  The 2006 SEC Order is a matter of public record and is available online at the SEC's website: http://www.sec.gov/litigation/admin/2006/33-8684.pdf.  Neither defendant was a party to the 2006 proceedings before the SEC or the 2006 SEC Order.

Among other things, the 2006 SEC Order described the practice by certain broker-dealers of submitting support bids to prevent auction failures.  In its findings, the SEC noted, without adequate disclosure, certain auctioneers and brokers bid to prevent auctions from failing.  Failed auctions occur when there are more securities for sale than there are bids for securities and result in an above-market rate described in the disclosure

documents.  These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate.  To the extent that certain practices affected the clearing rate, investors may not have been aware of the liquidity and credit risks associated with certain securities. 2006 SEC Order, at 6 & n.5.

The 2006 SEC Order "does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed."  See id. at 6 n.6.  One of the parties to the 2006 SEC Order was Merrill Lynch, from whom Dow Corning also claims to have purchased ARS.  Dow Corning has a separate lawsuit against Merrill Lynch pending in the Southern District of New York.

The plaintiff also brought actions against PNC and NatCity alleging that they were fully aware of the risks of ARS, that they misrepresented those risks to the plaintiff, and that they failed to inform the plaintiff of ARS's incompatibility with its investment goals. Months later, the plaintiff brought this action against the defendants in the Court of Common Pleas of Lancaster County, alleging that the defendants had the same duties to the plaintiff as PNC and NatCity had to the plaintiff, and that the defendants had also failed to inform the plaintiff of the risks of ARS.  The defendants removed the action to this court, citing the court's diversity jurisdiction.

The plaintiff alleges that there has been a widespread and long-running fraud involving every one of the major securities firms in the United States, including the defendants.  Defendant UBS Securities acted as the underwriter and broker-dealer/manager of the auctions for the auction rate securities, and UBS Financial Services

was the retail broker-dealer that distributed those auction rate securities to the public.
<u>See</u> Compl. ¶¶ 2-3.

**Material Omissions and False Representations by UBS**

UBS knew from at least August 2007 through February 2008 that without its
massive intervention in, and support bids for its ARC auctions, the auctions would
routinely fail. <u>Id.</u> at ¶ 88.  It also knew that those auctions which succeeded would clear
at a higher rate of interest, to the dissatisfaction of UBS's issuer clients.  UBS knew that
the failure of its ARC auctions would dramatically damage its ARC underwriting
business and its investment banking relationships with the issuers of ARC it had
underwritten, and would result in illiquidity and a steep decline in the value of ARC held
by UBS in its proprietary capacity.  <u>Id.</u>  Finally, UBS knew if the auctions it managed
failed its reputation as a reliable provider of investment banking services to issuers and as
a reliable broker-dealer for securities, purchaser-customers would be damaged.  <u>Id.</u>  This
knowledge gave UBS strong motivation to manipulatively prop up the auction markets
and to conceal that the risk of market failure was skyrocketing and that the markets were
moving towards catastrophic failure.  Indeed, UBS's David Shulman wrote a number of
emails from the late summer of 2007 through early 2008 citing "reputation risk," "market
risk," and "franchise risk" as reasons for continuing its manipulative trading in the ARC
markets.  These included a February 8, 2008 email to Robert Wolf, Chairman, and CEO
of UBS Group.  <u>Id.</u>

UBS failed to disclose the following material information in connection with the
purchase and/or sale of its ARC to the plaintiff:

(1) There was insufficient legitimate independent investor demand to avoid failure of the UBS ARC auctions in the period from August 2007 and thereafter.

(2) UBS placed proprietary support bids in the auctions it managed for the entire amount of the issue.  UBS had no independent investment purpose in placing these bids, but placed them to generate fees, maintain its investment banking clients, to protect the value of its own ARC holdings, and to deceive ARC purchasers by maintaining the increasingly illusory appearance of an independent, liquid, efficient, and reliable ARC market.

(3) The success of the UBS ARC auctions was entirely dependent on UBS's support bids.  Without the proprietary bids placed by UBS, the demand for the UBS ARC's was far lower than necessary for auctions to succeed, and those ARC could not have been sold at par or at any price other than a steep discount.

(4) UBS utilized inside information about the demand for ARC and the orders submitted by others to purchase ARC in determining rates and amounts at which to bid for its own account, thereby permitted it to manipulate the auctions.

(5) UBS controlled the rates at which the auctions would clear and engaged in conduct that both manipulatively depressed and manipulatively inflated those rates.

(6) The bids entered on behalf of UBS in auctions for the UBS ARC reduced the interest rate that would have otherwise resulted from the auctions.

(7) Without the manipulative bids placed by UBS for its own account, there was no liquid or functioning market for the UBS ARC.

(8) UBS owned a substantial inventory of the UBS ARC which, if offered for sale at auction, in the absence of manipulative UBS support bids, would result in almost universal failure of the UBS ARC auctions.

(9) By early fall 2007, UBS's proprietary inventories of UBS ARC were rising rapidly, it was unwilling to continue to place proprietary orders to prevent auction failures indefinitely, and the risk that the auctions would fail was rising dramatically and becoming imminent.

(10) That UBS and other contractual broker-dealers had obtained temporary maximum interest rate waivers from issuers to artificially stimulate demand, perpetuate the false appearance of stable and efficient auction markets, and delay imminent auction failures, and that widespread auction failures were nearly certain to result from the expiration of the waivers.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim.  Conley, 355 U.S. at 47.  Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.  The "complaint must allege facts suggestive of [the proscribed] conduct."  Twombly, 550 U.S. at 564.  Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true.  See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).  The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements.  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

## III.    DISCUSSION

Complaints that allege fraud must satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act of 1995.  A complaint "must state with particularity the circumstances constituting fraud."  FED. R. CIV. P. 9(b).  Rule 9(b) of the Federal Rules of Civil Procedure provides that "a party must state with particularity the circumstances constituting fraud or mistake."  Id.

The United States Court of Appeals for the Third Circuit has determined that in order to comply with the particularity requirement of a fraud claim, the following elements must be pled:  (1) A specific false representation of material facts; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the

11

person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage.  <u>Christidis v. First Pennsylvania Mortgage Trust</u>, 717 F.2d 96, 99 (3d Cir. 1983).  "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud."  <u>In re Theragenics Corp. Securities Litigation</u>, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) (citing <u>Brooks v. Blue Cross and Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997)).  A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  <u>See</u> 15 U.S.C. § 78u-4(b)(2).  A strong inference is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 314 (2007).

Rule 9(b) applies "not only to fraud actions under federal statutes, but to fraud claims based on state law."  <u>Christidis v. First Pennsylvania Mortg. Trust</u>, 717 F.2d 96, 99 (3d Cir. 1983).  "[F]ocusing exclusively on [Rule 9[b]'s] 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'"  <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984) (quoting <u>Christdis v. First Pa. Mortgage Trust</u>, 717 F.2d 96, 100 (3d Cir. 1983)).  Rule 9(b) requires the plaintiff plead "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with

which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting Seville Indus. Mach. Corp., 742 F.2d at 791). "[A]llegations of 'date, place or time' fulfill these functions," but plaintiffs may also "use alternate means of injecting precision and some measure of substantiation into their allegations of fraud." Seville Indus. Mach. Corp., 742 F.2d at 791. In addition, where plaintiffs allege a fraud scheme, courts have "recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years." United States ex rel. Singh v. Bradford Reg'l Med. Ctr., 2006 U.S. Dist. LEXIS 65268, 2006 WL 2642518, at *4 (E.D. Pa. Sept. 13, 2006) (quoting United States ex rel. Landsberg v. Argentis Med., P.C., 2006 U.S. Dist. LEXIS 96621, 2006 WL 1788381, at *4 (E.D. Pa. June 27, 2006)).

## A.   Violation of Pennsylvania Securities Act, Section 1-401 and Section 1-403

It has been held that § 1-401[3] of the Pennsylvania Securities Act ("PSA") was enacted to address substantially the same wrongful conduct as Rule 10b-5.[4] Leder v.

---

[3] Under § 1-401, it is unlawful for any person, in connection with the offer, sale or purchase of any security in Pennsylvania, directly or indirectly:

> (a)To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

70 Pa. Stat. § 1-401.

70 Pa. Stat. § 1-403 provides that:

> No broker-dealer or agent shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this State by means of any manipulative, deceptive or other

fraudulent scheme, device, or contrivance, fictitious quotation, or in violation of this act or any regulation or order hereunder.

70 Pa. Stat. § 1-403.

[4] The parties to this action disagree as to the relationship between §§ 1-401 and 1-501. Fulton argues that § 1-501(a)(ii) creates a separate, stand-alone cause of action modeled on § 12(2) of the federal Securities Act of 1933, codified at 15 U.S.C. § 77l(a)(2). Fulton argues that because § 1-501 provides the cause of action for § 1-401 of the PSA, a § 1-401claim does not require the pleading of SEC Rule 10b-5 elements. Specifically, Plaintiffs contend that because of § 1-501 language to make out a § 1-401 claim, they do not need to prove: (1) that they reasonably relied on any alleged misrepresentations, (2) that UBSS acted with scienter, or (3) that the misrepresentations and/or omissions were the proximate cause of their losses. (Doc #18 at 31).

PSA § 501(a)(ii) provides:

> Any person who: (ii) offers or sells a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security[.]

§ 1-501(a) of the Pennsylvania Act is modeled on § 410(a)(2) of the Uniform Act, which is in turn modeled on § 12(2) of the 1933 Act. Notably, § 1-501(a) is written in the disjunctive. Therefore, it definitively provides a civil remedy against "any person who […] offers or sells a security in violation of section § 401." Although there is some confusion as to whether § 1-501 creates a separate and additional cause of action under § 1-501 itself, it arguably provides that any person who "otherwise" violates the terms of § 1-501(a) "shall be liable to the person purchasing the security from him." Based on this disjunctive phraseology, the analysis in Kronenberg states that the Pennsylvania Supreme Court does recognize a stand-alone § 1-501 claim, but distinguishes it from a § 1-401 claim. Kronenberg v. Katz, 872 A.2d 568, 596 (Del. Ch. 2004). In In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 269-70 (3d Cir. 2006), the court commented that § 77l(a)(2), from which § 1-501 is modeled, is a "virtually absolute liability provision that does not require an allegation that defendants possessed scienter." Id. To state a prima facie case under § 1-501, requires Plaintiffs to demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation, scienter or reliance. Gilliland v. Hergert, 2008 U.S. Dist. LEXIS 51421 (W.D. Pa. July 1, 2008).

UBS argues that § 1-501 does not modify the private right of action for violations of §§ 1-401 or 1-403. Specifically, the Defendant notes that it has been acknowledged by courts "that section 501 provides an independent cause of action[;]" however, courts require that "section 401 claims brought under section 501 must satisfy the familiar elements of a 10b-5 claim, including scienter." See, e.g., Gilliland, 2008 WL 2682587, at *7; GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 214 (3d Cir. 2001) (quoting Rosen v. Commun. Servs. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001)); Kronenberg, 872 A.2d at 596; and Leder, 609 F. Supp. 2d 386. I agree with Defendants.

The Pennsylvania Securities Act is based on the 1956 Uniform Securities Act (the "Uniform Securities Act" or "Uniform Act"), and § 1-401 of the Pennsylvania Act is modeled on § 101 of the Uniform Act. Section 101, in turn, is based on SEC Rule 10b-5, promulgated under the federal Securities Exchange Act of 1934, which is modeled on § 17(a) of the federal Securities Act of 1933. A number of Pennsylvania decisions analogize § 1-401 to Rule 10b-5, and conclude that a cause of action under the PSA must contain similar elements to those in a 10b-5 claim. See, e.g., McFeeley v. Florig, 966 F. Supp. 378, 382 & n.8 (E.D. Pa. 1997) (stating that "the anti-fraud provisions of the Pennsylvania Securities Act and the 1934 Securities Exchange Act are functionally identical" and that "Section 1-

<u>Shinfeld</u>, 609 F. Supp. 2d 386, 395 (citing <u>Goodman v. Moyer</u>, 523 F. Supp. 35, 38 n.8 (E. D. Pa. 1981)).  Given this fact and the absence of determinative case law as to what is required to make out a cause of action under the PSA, the federal courts and the Pennsylvania trial courts that have considered the issue have uniformly treated PSA claims as requiring the same elements of proof as required under Rule 10b-5 and have therefore analyzed them in identical fashion.  <u>Leder</u>, 609 F. Supp. 2d at 395 ("it has long been the practice in this Circuit to treat section 1-401 claims as requiring the same elements of proof as required under Rule 10b-5"); <u>Majer v. Sonex Research, Inc.</u>, 541 F. Supp. 2d 693, 712-13 (E.D. Pa. 2008) (same); <u>Joyce v. Bobcat Oil & Gas Co.</u>, Civ. A. No. 1:07-1421, 2008 U.S. Dist. LEXIS 27181 at *40 (M.D. Pa. April 3, 2008); and <u>Sunquest information Systems, Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 659 (W.D. Pa. 1999).

Therefore, the elements of this cause of action are: (1) that the defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's

---

401 substantially echoes Rule 10b-5's language"); <u>Goodman v. Moyer</u>, 523 F. Supp. 35, 38-39 & n.8 (E.D. Pa. 1981) (indicating that the Commissioner's Note to section 101 of the Uniform Securities Act, "from which section [1-]401 of the Pennsylvania Securities Act is taken, reads: 'This section is substantially the Securities and Exchange Commission's Rule (10b-5).'").  See also <u>Joyce v. Bobcat Oil & Gas Co.</u>, Civ. A. No. 1:07-1421, 2008 U.S. Dist. LEXIS 27181 at *40 (M.D. Pa. April 3, 2008); <u>Sunquest information Systems, Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 659 (W.D. Pa. 1999).

Additionally, regardless of whether § 1-501independently creates a cause of action other than through §1-401, Fulton has not alleged a violation under § 1-501.  Therefore, it must satisfy the elements of their §1-401 claim, which is modeled after SEC Rule 10b-5.

reliance was the cause of its injury.[5]  Beck v. Arcadia Capital Group, Inc., 2009 U.S.

Dist. LEXIS 91608, *28-29 (E.D. Pa. Sept. 30, 2009) (quoting Gilliland v. Hergert, Civ.

A. No. 05-1059, 2007 U.S. Dist. LEXIS 84508, at *5 (W.D. Pa. Nov. 15, 2007)).  See

also In re Alpharma, 372 F.3d at 147 (quoting In re Ikon Office Solutions, Inc., 277 F.3d

658, 666 (3d Cir. 2002)).  Additionally, although Rule 10b-5 requires a higher pleading

requirement than a claim under the PSA, the Plaintiff must still satisfy Fed. R. Civ. P.

9(b).  See Majer, No. 05-606, 2006 U.S. Dist. LEXIS 49531, 2006 WL 2038604, at *12

n.15 (E.D. Pa. July 19, 2006) ("Although the state law fraud claims are not subject to the

heightened pleading requirements of the [PSLRA], they must be 'stated with

particularity' under the heightened pleading standard of Fed. R. Civ. P. 9(b)."); and

Joyce, 2008 U.S. Dist. LEXIS 27181, 2008 WL 919724, at *14 (same).

1.        Material Omission

        Pursuant to both § 10(b) of the federal law and § 1-401 of Pennsylvania law,

information becomes "material" when there is "a substantial likelihood that the disclosure

---

[5] UBS contends that it is not in privity with Fulton and, therefore, cannot be sued, because it is not a seller or buyer as required by the statute at issue because Fulton's brokers, not Fulton, purchased securities from UBS.  (Doc #17 at 23; Compl. ¶ 26).  See e.g., Biggans v. Bache Halsey Stuart Shields, Inc., 638 F.2d 605, 610 (3d Cir. Pa. 1980).  See also, Jairett v. First Montauk Sec. Corp., 153 F. Supp. 2d 562 (E.D. Pa. 2001) (stating that a sole source of civil liability under 70 P.S. § 1-401, 70 P.S. § 1-403, and 70 P.S. § 1-404 is section 70 P.S. § 1-501; such a claim only allows for a private cause of action against a buyer or a seller, not a broker).

However, courts have recognized that a broker that solicits and executes securities sales, but does not own the securities, may be a "seller" subject to liability under section 501(a).  See Pinter v. Dahl, 486 U.S. 622 (1988).  Additionally, courts have held that one who is "substantially involved" in a sale can be considered a seller.  Gilliland, 2007 WL 4105223, at *4 (W.D. Pa. Nov. 15, 2007) (citing Brennan v. Reed, Smith, Shaw & McClay, 412 A.2d 740, 747 (1982)).  But see Fox Int'l v. Fiserv. Secs. Inc., 490 F. Supp. 2d 590, 603 (E.D. Pa. 2007) (contrary decision).  In this case, UBS is an auction manager, which means it is not Fulton's broker, but Fulton alleges that UBS did execute sales of its own ARCs, which Fulton purchased through its brokers.  Auction managers are selected by the issuers for the purpose of making a market in the issuers' ARCs.  Fulton's brokers in this case were PNC and NatCity.  I will find in Fulton's favor on this issue because there are issues of material fact as to whether UBS acted like a seller with regard to Fulton.  However, Fulton has to prevail on each element of the test to survive UBS's Motion to Dismiss.

of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  See also Basic v. Levinson, 485 U.S. 224, 232 (1988) (applying the Northway rule in the § 10(b) context); GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 214 (3d Cir. 2001) (citing Rosen v. Commun. Servs. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001)).  Materiality is a mixed question of law and fact and should be decided as a matter of law "only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ." In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir. 1989).

When deciding whether an omission is actionable it must first be determined whether the defendant was under a duty to disclose at the time at issue.  Staffin v. Greenberg, 672 F.2d 1196, 1202 (3d Cir. 1982).  Then the court must decide whether the alleged omission or misstatement was material.  Id.  If, under the facts of the case, "no duty to disclose exists, or if the undisclosed facts are not material, there is no liability under Rule 10b-5." Id.  See also Weisblatt v. Minn. Mut. Life Ins. Co., 4 F. Supp. 2d 371, 380 (E.D. Pa. 1998) (stating that omissions are only actionable where there is a duty to disclose).  A duty to disclose arises only when one party to a transaction has material information that the other party is entitled to have because of some relationship of trust and confidence between the parties, such as when one party is a fiduciary, corporate insider, or "tippee."  See Chiarella v. United States, 445 U.S. 222, 229 (1980).

Whether a fiduciary duty exists cannot be determined by recourse to rigid formulas.  Rather, it depends upon whether one person has reposed trust or confidence in

another who thereby gains a resulting superiority or influence over the first.  More simply, the existence of fiduciary duties depends on the facts of a particular relationship.  Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar, 274 F. Supp. 2d 701, 708 (W.D. Pa. 2003).  Under Pennsylvania law, fiduciary obligations do flow from the securities broker to the customer.  See Merrill Lynch v. Perelle, 514 A.2d 552, 560 (Pa. Super. 1986); and Jaksich v. Thomson McKinnon Securities, Inc., 582 F. Supp. 485, 502 (S.D.N.Y. 1984).  Nevertheless, it is clear that these fiduciary obligations are circumscribed.  See, e.g., Perelle, 514 A.2d at 560 (finding that "the broker is subject to certain fiduciary obligations to his client").  For instance, a lesser duty is required for those brokers having a non-discretionary account as compared to a discretionary account.[6]  Gouger v. Bear, Stearns & Co., 823 F. Supp. 282, 287 (E.D. Pa. 1993).

---

[6] The fiduciary duties of a broker to a client who maintains a non-discretionary account are described in Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar, which states:

> Where the account is a nondiscretionary account, the duties of the broker include: (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer. These duties, however, are not all encompassing.

274 F. Supp. 2d 701, 708 (W.D. Pa. 2003) (quoting Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951, 953 (E. D. Mich. 1978)).  Moreover,

> [T]he precise manner in which a broker performs these duties largely depends upon the intelligence and personality of his customer.  For example, where the customer is uneducated or generally unsophisticated with regards to financial matters, a broker must define the potential risks of a particular transaction carefully and cautiously.   Conversely, where a customer fully understands the dynamics of the stock market or is personally familiar with the security, the broker's explanation of such risks may be cursory.

Continental Life Ins. Co. v. Shearson Lehman Hutton, Inc., 1992 U.S. Dist. LEXIS 356 (E.D. Pa. Jan. 10, 1992) (citing Leib., 461 F.Supp. 951).

Fulton alleges that UBS was Fulton's broker-dealer and, as such, owed Fulton a fiduciary duty.[7]  Compl. ¶ 71.  Fulton does not allege any statements made by UBS. Therefore, only UBS alleged omissions are actionable.  Fulton alleges that had it been told the true auction manager role in supporting the auctions despite insufficient investor demand, it would not have continued investing in the ARS.[8]  Additionally, Fulton asserts that, had it known the instability of the market, it would not have not have purchased ARS.[9]

UBS contends that all duties Fulton mentions are duties UBS owed to the issuer as part of UBS managing their auctions, not to the investors whose brokers purchased ARS in those auctions.[10]  Even though UBS asserts it had no duty to disclose to Fulton, UBS did disclose the practices and risks that Fulton now claims were concealed.

---

[7] The complaint alleges that:

> The Contractual BD assumes a number of duties to the investors who place orders through it.  (a) The Contractual BD assumes the obligations of soliciting bids . . . from potential and existing owners of ARCs. (b) For a potential owner . . . , the Contractual BD assumes the obligation of submitting the potential owner's offer to purchase accurately and in a timely manner to the auction agent . . . [and] [i]f the offer is successful, the Contractual BD has the duty to facilitate the settlement of the ARC purchase transaction. (c) . . . the Contractual BD assumes the obligation of submitting the existing owner's sell order. . .  (d) . . . the Contractual BD has the obligation of submitting a "hold order" on behalf of the existing owner. . .  (e) The Contractual BD assumes the obligation of aggregating all buy or sell orders that specify the same interest rate [and] . . . assumes the obligation to communicate the results of the auction . . . and to facilitate settlement[.]

Compl. ¶ 20.

[8] Fulton alleges that the success of the UBS ARC auctions was entirely dependent on UBS's support bids and that UBS had no independent investment purpose in placing these bids, aside from generating fees, maintaining clients, protecting the value of its own ARC holdings, and to deceiving ARC purchasers.

[9] Fulton alleges that UBS manipulatively depressed and inflated market rates and without UBS bids there was no liquid market for ARS.

[10] For example, Fulton is the investor in this case.

Fulton allegations that UBS acted as a broker-dealer in relationship to Fulton and not simply as an auction manager are conclusory and unsupported by the facts. Fulton refers to NatCity and PNC as its brokers. Fulton had no contact or agreement with UBS, and the transactions between Fulton and UBS took place through NatCity and PNC. UBS was an ARS auction manager hired by issuers of ARS to manage auctions, to submit sell orders and bids, and to facilitate settlements of successful bids and the mechanics of the auction.

Even if UBS was Fulton's "broker," UBS had no discretion over Fulton's account and there was no allegation that the relationship between the parties gave rise to a level of trust or dependence. See e.g., Antinoph v. Laverell Reynolds Sec. Inc., 703 F. Supp. 1185, 1188 (E.D. Pa. 1989) (dismissing claims against clearing brokers under the PSA and Pennsylvania common law for lack of duty to disclose to investors); Commw. ex rel. Corbett v. Snyder, 977 A.2d 28, 47 (Pa. Commw. Ct. 2009).

Finally, Fulton is a very sophisticated investor with far more "broker-confidants" than simply UBS and would have fully understood the dynamics of the market and the security; therefore, UBS's explanation to Fulton of any risks may be cursory. See Continental Life Ins. Co., 1992 U.S. Dist. LEXIS 356 (E.D. Pa. Jan. 10, 1992). Consequently, if UBS did have a duty to disclose to Fulton, UBS made sufficient disclosures. Fulton claims that UBS's manipulative conduct included actions such as placing support bids, which created a false appearance that the ARC market was doing well. Compl. at ¶ 121. But, UBS disclosed considerable amount of information regarding its role in the ARC auctions, including that it frequently placed support bids to

20

keep the auctions from failing.[11]   (Doc. #21 at 17 (citing Guide to Cash Alternatives,

Hangley Decl., Ex. 3 at 6)).   Given the actual relationship between UBS and Fulton, I

find that Fulton failed to allege that UBS had a duty to disclose.   Furthermore, even if

UBS had a duty to disclose Fulton failed to allege that UBS did not adequately disclose

material facts.

2.        Scienter

    The Third Circuit has held §§ 1-401 and 1-403 of the PSA require pleading and

proof of scienter.   See GFL Advantage Fund, 272 F.3d at 214.   To satisfy the element of

scienter the plaintiff must include allegations that defendant's misrepresentations or

omissions were undertaken with the intent to defraud the plaintiff.   See Id. (quoting

Rosen v. Commun. Servs. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001)).

See also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting

In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).   A plaintiff may satisfy a

required showing of scienter by "(a) alleging facts to show that the defendant had both

motive and opportunity to commit fraud, or (b) alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."   In re Burlington Coat

Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

---

[11] UBS cites to statements made to broker-dealers as well as investors, which were contained in its Guide to Cash
Alternatives and the UBS Municipal Securities Auction Rate Certificates.  These statements explained that: 1) UBS
frequently submitted ARS bids to keep the auction from failing in a large percentage of auctions, 2) UBS's actions
may have posed conflicts of interest, 3) UBS could elect to abstain from bidding, which could cause the auction to
fail, and 4) if an auction failed the maximum interest rates could be higher or lower than the market rate.

UBS argues that scienter cannot be pled given that it disclosed all material information to Fulton[12] and neither UBS nor any other market participant could have known that auctions were destined to fail on February 13, 2008.  (Doc #17 at 35).

Fulton argues that it need not allege scienter because its § 1-401 claim does not require the 10b-5 elements.[13]  It also argues that it has pled scienter by demonstrating the basis and source of UBS's knowledge of the true state of the market, its intent to manipulate the market, the method by which it manipulated the market, and its purpose in manipulating the market.  Compl. ¶¶ 13-23, 31-52.

What Fulton fails to explain is how UBS could have intended to defraud Fulton when UBS had no direct contact with Fulton and no knowledge of what Fulton's retail brokers said to their clients about ARS.  Fulton's allegations regarding UBS's bad motive for the alleged omissions are conclusory and focus principally UBS's actions buying and selling ARS despite its alleged knowledge of the market frailty.[14]  However, Fulton's allegations give rise to an opposing and compelling inference that UBS only engaged in bad business judgment in connection with ARS, which has come to light through the advantage of hindsight, and did not engage in the alleged conduct with an intent to

---

[12] UBS affirmatively disclosed the material facts concerning its role in the ARS exchange.  For example, UBS stated that "[T]he Firm – with full knowledge of the bids submitted by other auction participants – may deem it appropriate (though not obligatory) to submit bids for its own account . . . to prevent a failed auction."  Guide to Cash Alternatives, Hangley Decl., Ex. 3 at 6; see also, UBS Municipal Securities Auction Rate Certificates ("UBS Muni. Sec. ARCs"), Hangley Decl., Ex. 2 at 2 (same).  Additionally, UBS disclosed that "The Firm bids in a large percentage of auctions and believes that a significant number of auctions would fail if it did not do so."  Guide to Cash Alternatives, Hangley Decl., Ex. 3 at 6.

[13] See Supra note 6.  See also Leder, 609 F. Supp. 2d at 396-97 (scienter is a necessary element of claims under § 1-401).

[14] Fulton also focuses on UBS's failure to disclose material information.

deceive investors.[15]  Additionally, the fact that UBS could earn substantial sales commissions and fees for underwriting the securities and managing ARS auctions is an allegation that could be imputed as motivation for simply making profit and is not sufficiently concrete to infer scienter.[16]  Therefore, I find that Fulton has not proved this element.

3.     Reliance

To establish a claim under the analysis set forth in Rule 10b-5, a plaintiff must show that he reasonably relied on the alleged misrepresentations or omissions that form the basis of his claims.  The "reasonable reliance" element requires a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect his own interests.  AES Corp. v. Dow Chem. Co., 325 F.3d 174, 178 (3d Cir. 2003).  In the context of Rule 10b-5, the Third Circuit set forth a list of factors that the court should consider in determining whether a plaintiff's reliance was reasonable.  Leder, 609 F. Supp. 2d at 397.  Those factors include the plaintiff's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of a longstanding business or personal relationship, and the plaintiff's access to the relevant information.  Id. (citing Straub v. Vaisman & Co., 540 F.2d 591 (3d Cir. 1976)).

---

[15] See e.g., In re Citigroup Auction Rate Securities Litigation, Nos. 08 Civ. 3095, 09 MD 2043, 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009); Ashland v. Morgan Stanley & Co., No. 09 Civ. 5415, 2010 WL 1253932, at *11 (S.D.N.Y. Mar. 30, 2010) (pointing out that it was economically irrational for the broker-dealer to purchase billions of dollars in auctions of ARS in order to induce the investor and, therefore, did not adequately show scienter).

[16] See e.g., Defer LP v. Raymond James Financial, Inc., 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009).

Fulton again erroneously claims that it need not satisfy the element of reliance because it is not necessary for its claim under PSA §§ 1-501 and 1- 503 for violations of PSA §§ 1-401 and 1- 403.[17]   Additionally, Fulton argues that the reasonableness is an issue of fact not properly determined on a motion to dismiss.  (Doc. #18 at 59) (citing Neuberger v. Shapiro, 1998 WL 408877, at *5 (E.D. Pa. July 17, 1998)).  UBS claims that Fulton has failed to plead facts showing reasonable reliance and argues that reliance could not be reasonable because UBS disclosed the risks of auction failure to Fulton. (Doc. #17 at 29-32).

The fundamental flaw in Fulton's argument is that it has failed to allege any statements or actions made by UBS upon which it relied.  Fulton appears to have already made its decision to invest in ARS before it could have relied on UBS.  Fulton initially contacted its brokers PNC and NatCity, who encouraged purchasing ARS, so it is much more likely that if any reasonable reliance occurred, it was based on those exchanges, independent of UBS.  Finally, Fulton's reliance, if any, on UBS would not be reasonable because Fulton is a sophisticated plaintiff, with no longstanding business relationship with UBS, and had at least minimal access to the relevant information concerning the auction process.

4.        Loss Causation

The loss causation requirement means that the plaintiff must show that its injury, such as the decrease in market value of some security it owned, was proximately caused

---

[17] See Supra note 6.  In Pell v. Weinstein, 759 F. Supp. 1107, 1115 (M.D. Pa. 1991), aff'd, 961 F.2d 1568 (3d Cir. 1992), a federal district court concluded that reliance was required for all of the plaintiff's fraud claims, including a claim under the Pennsylvania Securities Act.

by the defendant's fraudulent conduct, and not by some other cause.[18]  <u>Dura</u>

<u>Pharmaceuticals Inc. v. Broudo</u>, 544 U.S. 336 (2005); <u>Tse v. Ventana Med. Sys.</u>, 297

F.3d 210, 218 (3d Cir. Del. 2002); and <u>McCabe v. Ernst & Young, LLP</u>, 494 F.3d 418,

426 (3d Cir. 2007).  As to economic loss, the analysis requires the plaintiff to establish "a

decline in the security's price, thus creating an actual economic loss for the plaintiff."  <u>Id.</u>

at 425-26.  The <u>McCabe</u> court ruled that loss causation "becomes most critical at the

proof stage," <u>id.</u> n.4 (quoting <u>EP MedSystems, Inc. v. EchoCath</u>, Inc., 235 F.3d 865, 884

(3d Cir. 2000)), and recognized that "[l]oss causation issues can be highly factual."  <u>Id.</u>

Fulton argues that it has suffered monetary damages as a direct result of the

omissions by UBS and that this economic loss would not have occurred but for those

misrepresentations.  Fulton alleges it would not have purchased ARCs had UBS disclosed

the non-public information in its possession and that Fulton would have sold the ARCs it

already owned.  Compl. ¶¶ 32-34, 36-38, 40-42.  Finally, Fulton contends that lost

causation is an issue of fact not to be determined on a motion to dismiss. (Doc. #18 at

69).

Although UBS's practice of bidding during their auctions inflated the value of the

securities, which then plummeted when the auctions began to fail, the Supreme Court

explicitly rejected the argument that a § 10(b) plaintiff could satisfy the loss causation

requirement simply by showing that "the price on the date of purchase was inflated

---

[18] Consistent with <u>Dura</u>, courts have held that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening market events."  <u>See, e.g.</u>, <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161 (2d Cir. 2005).

because of the misrepresentation."  Dura Pharms., Inc., 544 U.S. 336, 342 (2005).

Additionally, the alleged correlation between UBS's actions and the market failure is

unsubstantiated.  The failures were fundamentally caused by intervening macroeconomic

phenomena, namely, a decrease in ARS demand ultimately stemming from a global credit

crisis, which had its roots in the subprime mortgage crisis.  Market activity like this

decreases the likelihood that a plaintiff can succeed on a fraud claim.  Finally, UBS's

contention that it disclosed the material information about its auction process is still a

hurdle that Fulton has yet to overcome.

## B.      Violation of Pennsylvania Securities Act, Section 1-402

PSA § 1-402 is entitled "Market Manipulation" and it defines three distinct types

of unlawful manipulation.  Fulton focuses its attention on § 1-402(b), which most

applicably provides – "It is unlawful for any person, directly or indirectly, in this State:

… [t]o effect, alone or with one or more other persons, a series of transactions in any

security creating actual or apparent active trading in the security or raising or depressing

the price of the security for the purpose of inducing the purchase or sale of the security by

others."[19]  70 P.S. § 1-402(b).

Fulton maintains that there is no similarity between the language of § 10(b) or

Rule 10b-5 and PSA § 1-402 because neither 10(b) nor 10b-5 refers to "market

---

[19]  § 1-402(c) provides it is also unlawful "to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of the security will or is likely to rise or fall[.]" 70 P.S. § 1-402(c).

manipulation."[20]  Additionally, Fulton argues that PSA §§ 1-501(c) and 1-503(a) provide private rights of action for violation of § 1-402, and in contrast to 10(b), PSA §§ 1-501(c)[21] and 1-503(a)[22] do not require a showing of fraudulent intent or reliance.[23]

There is a lack of precedent as to what elements must be pled and proven to sustain a cause of action under § 1-402 nor have the parties cited to such.  In as much as § 1-401 and § 1-403 are to be analyzed under a Rule 10(b) framework, it is appropriate to evaluate a § 1-402 claim in the same fashion as claims advanced under §§ 1-401, 1-403, and Rule 10(b).  Additionally, § 1-703 of the Pennsylvania Securities Act states, "This act shall be so construed as to effectuate its general purpose to make uniform the law of

---

[20] UBS argues that§ 1-402 should be interpreted as identical to a claim of Market Manipulation under section 10(b) of the Securities and Exchange Act of 1934.  (Doc. #17 at 35).

[21] Section 1-501(c) states:

> Any person who willfully participates in any act or transaction in violation of section 402 shall be liable to any other person who purchases or sells any security at a price which was affected by the act or transaction for the damages sustained as a result of such act or transaction.  Damages shall be the difference between the price at which the other person purchased or sold securities and the market value which the securities would have had at the time of his purchase or sale in the absence of the act or transaction, plus interest at the legal rate.

70 P.S. § 1-501(c).

[22] Section 1-503(a) states:

> Every affiliate of a person liable under section 501 or 502, every partner, principal executive officer or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person liable hereunder proves that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

70 P.S. § 1-503(a).

[23] To state a prima facie case, the plaintiff must simply "allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication."  Id.  By its text, § 1-501 puts the burden on Defendant to prove "that he did not know and in the exercise of reasonable care could not have known of the untruth or omission."  In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 269-70 (3d Cir. 2006); see also In re Donald J. Trump Casino Securities Litigation - Taj Mahal, 7 F.3d 357, 368 n.10 (3d Cir. 1993).

those states which enact the 'Uniform Securities Act' and to coordinate the interpretation and administration of this act with related Federal regulation."  70 Pa. Stat. § 1-703.  The Court of Appeals for the Third Circuit has stated that there is a substantial difference between Rule 10b-5 claims and § 77l claims, and the goal of uniformity would suggest overwhelmingly that the § 1-402 analysis should mirror its surrounding sections.

Thus, to maintain a private right of action for market manipulation under § 10(b) and Rule 10b-5, a plaintiff must still prove the basic elements of (1) reliance; (2) scienter; and (3) damages in connection with the purchase or sale of securities.[24]  In re Safeguard Scientifics, 2004 U.S. Dist. LEXIS 23796 (E.D. Pa. Nov. 17, 2004)(citing GFL Advantage Fund, 272 F.3d at 206, n. 6; and In re Bell Atl. Corp. Sec. Litig., 1997 U.S. Dist. LEXIS 4938, 92-93, 1997 WL 205709 (E.D. Pa. 1997)).  Market manipulation is virtually a term of art when used in connection with the securities market.  It connotes intentional and willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.  GFL Advantage Fund, Ltd., 272 F.3d at 204 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)).

Fulton alleges that UBS unlawfully manipulated the market by creating a false or misleading appearance, directly and indirectly, with respect to the market for ARS,

---

[24] Specifically, a plaintiff must plead that:

(1) in connection with the purchase or sale of securities, (2) defendant engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security, (3) for the purpose of artificially depressing or inflating the price of the security; (4) that plaintiff reasonably relied on the artificial stock price; (5) that plaintiff's reliance proximately caused plaintiff's damages; and (6) that defendant acted with scienter.

Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615 (D.N.J. 2003).

creating actual or apparent active trading, and creating actual or apparent inflation of the price of the security to induce others to purchase the security.  Compl. ¶ 121.  Throughout the Complaint, Fulton pleads that UBS's support bids created the illusion of active trading and efficient ARC markets to induce investors, including Fulton, to purchase ARCs.  Compl. ¶¶ 9-10, 34-43.

The Third Circuit has stated, on many occasions, that in order for a § 10(b) claim to survive a motion to dismiss, a plaintiff must plead reliance, causation of damages, and scienter.  Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 628 (D.N.J. 2003) (citing Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir. 2000)).  For the reasons articulated above, plaintiff has failed to allege these elements sufficiently to withstand a motion to dismiss.  Additionally, an act cannot be indicted as manipulative when the Defendant, as in this case, made no misrepresentation or nondisclosure.

## C.      Negligent Misrepresentation

The elements of the tort of negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make their presentation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) the injury must result to the party acting in justifiable reliance on the misrepresentation.[25]

---

[25] Pennsylvania draws its Negligent Misrepresentation claim from Restatement (Second) of Torts, § 552, which provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their

<u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (1994).  "An omission or nondisclosure is only

actionable under the theory of negligent misrepresentation if there is a duty to speak."

<u>Weisblatt</u>, 4 F. Supp. 2d at 380.  Moreover, "Pennsylvania law restricts liability for

negligent misrepresentations to a 'person or limited group of persons'" for "whose

benefit and guidance [defendants] intended to supply the information."  <u>In re Chambers

Dev. Sec. Litig.</u>, 848 F. Supp. 602, 625 (W.D. Pa. 1994) (citing Restatement (Second) of

Torts, § 552).

 Fulton states that it has alleged sufficient facts pleading negligent

misrepresentation because UBS failed in its duty to inform Fulton of the risks involved in

purchasing or selling a particular security.  Compl. ¶¶ 142-49, 150-53.  UBS argues

primarily that a duty to disclose never arose between UBS and Fulton, and, if it did, UBS

properly disclosed all material facts.  Additionally, UBS contends that the

misrepresentations, if any, were not made directly to and for the plaintiff, but to the entire

investing public, which is far more than a limited number of persons.

 Here, the alleged omissions (the frailty of the market and UBS's role as auction

manager) "would have been viewed by the reasonable investor as having significantly

altered the 'total mix' of information made available" to influence plaintiff's decision to

---

business transactions, is subject to liability for pecuniary loss caused to them  by their justifiable
reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or
communicating the information.
(2) The liability in subsection (1) is limited to loss suffered
(a) By the person or one of a limited group of persons for whose benefit and guidance he intends
to supply the information or knows that the recipient intends to supply it; and
(b) Through reliance upon it in a transaction that he intends the information to influence or know
that the recipient so intends or in a substantially similar transaction.
(3) The liability of one who is under a public duty to give the information extends to loss suffered
by any of the class of persons for whose benefit the duty is created, in any of the transactions in
which it is intended to protect them.

invest in ARS.  See EchoCart, 235 F.3d at 872 (quoting Basic Inc. v. Levinson, 485 U.S.

224, 231-32 (1988)).  However, regardless of whether UBS could have known about the

market frailty, UBS had no duty to inform Fulton of these facts and, as discussed in part

II.A.1. despite having no duty, UBS made sufficient disclosures regarding these material

facts.

Whether the omissions were made to a limited group is more controversial

because courts examining this issue are divided on whether public investors constitute a

"limited group of persons for whose benefit and guidance [defendants] intend to supply

the information."[26]  Regardless, given the analysis in parts II. A.1. and II. A.3. above,

concerning whether UBS had a duty to disclose and whether Fulton acted in reliance

upon the alleged omissions, I find that Fulton cannot state a claim for relief under

negligent misrepresentation.

**D.       Breach of Fiduciary Duty**

The complaint next alleges that the defendants breached a fiduciary duty owed to

the plaintiff.  A fiduciary relationship exists where there is a relationship involving trust

and confidence.  In order to prove this type of relationship a party must show confidence

reposed by one side and domination and influence exercised by the other.  Antinoph v.

Laverell Reynolds Sec., Inc., 703 F. Supp. 1185, 1188 (E.D. Pa. 1988).  It is not enough

to show that the plaintiff reposed its trust in the defendant; the latter must also have

---

[26] Compare In Re Chambers Development Secs. Litig., 848 F. Supp. 602, 626 (W.D. Pa. 1994) (allowing a cause of action to proceed) and In re Atlantic Financial Fed Sec. Litig., 1990 U.S. Dist. LEXIS 14807, 1990 WL 171191, at *2 (E.D. Pa. 1990) (same) with Pearl v. Geriatric & Medical Centers, Inc. et al., 1995 U.S. Dist. LEXIS 5475, 1995 WL 243675 (E.D. Pa. 1995) (dismissing negligent misrepresentation claim) and Wallace v. Systems & Computer Tech. Corp., 1997 U.S. Dist. LEXIS 14677 (E.D. Pa. Sept. 22, 1997) (same).

accepted the fiduciary relationship.  Id.  In determining whether a fiduciary relationship

exists, the critical question is whether the relationship goes beyond mere reliance on

superior skill, and into a relationship characterized by overmastering influence on one

side or weakness, dependence, or trust, justifiably reposed on the other side.  eToll, Inc.,

v. Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. 2002).  A confidential

relationship is marked by such a disparity in position that the inferior party places

complete trust in the superior party's advice and seeks no other counsel, so as to give rise

to a potential abuse of power.  Id.

Defendants contend that this count should be dismissed because no fiduciary

relationship existed between themselves and plaintiffs.  Fulton concedes that it

participated in ARS auctions solely through its retail brokers, PNC and NatCity, and

purchased ARS on their express recommendation.  Compl. ¶¶ 17, 24-26.  They attempt to

plead the existence of a direct fiduciary relationship by alleging that UBS's "superior

expertise and knowledge, unavailable and inaccessible to Fulton" made it "inequitable for

UBS not to disclose the information in its possession."  Compl. ¶ 80.

I find that there was no breach of fiduciary duty because no such relationship

developed between UBS and Fulton.  As discussed in part II.A.1., UBS never assented to

a direct fiduciary or agency relationship with Fulton.  Fulton purchased its securities

through its brokers, not UBS.  Even if UBS had a duty, it disclosed material facts

regarding the securities to Fulton.

**E.     Common Law Fraud**

The complaint next alleges common law fraud.  To sustain this claim, the Plaintiff must allege facts that satisfy the following elements:  (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994); see also Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005).  "The elements of common law fraud are 'almost identical' to the elements of Rule 10b-5 claims and claims under the PSA," and courts typically evaluate them in the same way.  Majer, 541 F. Supp. 2d at 713 (quoting Sunquest Info. Sys. Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 659 (W.D. Pa. 1999)).  As with statutory claims under the Pennsylvania Securities Act, allegations of common law fraud are subject to Rule 9(b)'s requirement of pleading with particularity.  This claim fails for the same reasons as the statutory fraud claims.

Fulton's Complaint alleges, among other acts that UBS  "knowingly and intentionally failed to disclose to Fulton: … the increasing risk of investing in ARCs … its various roles in the auction market … that it had obtained temporary waivers of maximum interest rate caps …" Compl. ¶ 155. The Complaint also states that Plaintiffs "justifiably relied on UBS … because of its duty to disclose[.]"  Id. at ¶ 157.

Given that common law fraud is to be analyzed in the same manner as a 10b-5 claim, the complaint does not allege facts sufficient to establish that UBS had a duty to

disclose, that Fulton justifiably relied on UBS's omissions, or that UBS acted with

scienter.  Accordingly, Count VI fails as a matter of law and must be dismissed.

## F.    Aiding and Abetting Common Law Fraud

Fulton next alleges a claim under aiding and abetting fraud; however, the

Pennsylvania Supreme Court has not expressly adopted the Restatement (Second) Torts §

876(b), on which Fulton relies for this claim.[27]  Fulton argues that the court adopted

aiding and abetting fraud in Skipworth by Williams v. Lead Indus. Ass'n, 547 Pa. 224

(Pa. 1997).[28]  Contrarily, UBS asserts that Skipworth has been applied only once to a

---

[27] UBS argues that dismissing the aiding and abetting fraud claims is appropriate, because these "claims do not exist under the law of Pennsylvania."  (Doc. #17 at 49).  See Amato v. KPMG LLP, 433 F. Supp. 2d 460, 474 (M.D. Pa. 2006) (finding Pennsylvania law does not allow for claims of aiding and abetting fraud);  S. Kane & Son Profit Sharing Trust v. Marine Midland Bank, 1996 U.S. Dist. LEXIS 8023, C.A. No. 95-7058, 1996 WL 325894, *9 (E.D. Pa. Jun. 13, 1996) (citing Clayton v. McCullough, 448 Pa. Super. 126, 670 A.2d 710, 713 (Pa. Super. Ct.), appeal denied, 677 A.2d 838 (Pa. 1996)).  The defendant's assertion is correct to that extent that the Pennsylvania Supreme Court has not adopted claims for aiding and abetting or acting in concert under §§ 876(a) and 876(b) of the Restatement (Second) of Torts.  See Klein v. Boyd, 1996 U.S. Dist. LEXIS 17153, *103, 1996 WL 675554, at *33 (E.D. Pa. Nov. 19, 1996) ("The Pennsylvania Supreme Court has never recognized a cause of action for aiding and abetting common law fraud."), aff'd in part and rev'd in part, 1998 U.S. App. LEXIS 2004, 1998 WL 55245 (3d Cir. 1998), rehearing en banc granted and judgment vacated, 1998 U.S. App. LEXIS 4121 (March 9, 1998); and Clayton, 670 A.2d at 713.

The plaintiff notes that "a cause of action for concerted activity under § 876 of the Restatement (Second) of Torts has been recognized by [several] Pennsylvania courts."  Larsen v. Philadelphia Newspapers, Inc., 602 A.2d 324 (Pa. Super. Ct. 1991), appeal denied, 641 A.2d 587 (Pa. 1994); see also, Jefferis v. Commonwealth, 537 A.2d 355, 358 (Pa. Super. Ct. 1988) (adopting liability test based on Restatement § 876).

[28] Interestingly, the Skipworth case does not mention even the word "fraud" once.  Fulton goes on to argue that subsequent cases have adopted the aiding and abetting fraud claim and ruled favorably on it.  See e.g., Sovereign Bank v. Ganter, 2006 PA Super 338, P19 (2006) and Miller v. Santilli, 2007 Phila. Ct. Com. Pl. LEXIS 252 (Pa. C.P. 2007).

In Sovereign Bank the Court addressed the applicability of § 876 under various circumstances referencing multiple cases, which have ruled under § 876.  Sovereign Bank v. Ganter, 2006 PA Super 338, 19 (2006).  See Brandjord v. Hopper, 688 A.2d 721 (Pa. Super. Ct. 1997), appeal denied, 704 A.2d 633 (Pa. 1997) (stating plaintiffs could not sustain cause of action for concerted tortious conduct, because liability cannot be imposed where passengers are "merely companions" who did nothing to substantially encourage or assist driver in his voluntary consumption of alcohol and operation of motor vehicle while intoxicated); Burnside v. Abbott Laboratories, 505 A.2d 973 (Pa. Super. Ct. 1985) (explaining plaintiffs could not sustain cause of action for concerted tortious conduct against pharmaceutical manufacturer, because plaintiffs did not allege tacit understanding, common design to market defective product, or that  manufacturer rendered substantial assistance in causing injury); Cummins v. Firestone Tire & Rubber Co., 495 A.2d 963 (Pa. Super. Ct. 1985) (stating plaintiff could not maintain cause of action for concerted tortious conduct, because he could not identify manufacturer of tire assembly which caused his injury, and

fraud claim by a lower Pennsylvania court and never to a claim of securities fraud.  (Doc. #17 at 50).  Moreover, UBS claims that no matter the standard applicable, Fulton fails to allege facts connecting UBS with NatCity or PNC.  Because this is an unsettled question of law, I will not dismiss the claims under the rationale that an aiding and abetting fraud claim does not exist in Pennsylvania.

The standard for civil aiding and abetting liability,[29] not specifically aiding and abetting fraud, which has been adopted by the Third Circuit is the one set forth in the Restatement of Torts.  See Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir. 1998). Section 876(b) "provides that a person is liable for harm resulting to a third person from the conduct of another when he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . .'"[30]  Failla, 146 F.3d at 158 (quoting the Restatement (Second) of Torts § 876(b)).

---

plaintiff failed to aver that manufacturer of wheel rims rendered substantial assistance to manufacturers who had allegedly engaged in concerted tortious conduct); Kline v. Ball, 452 A.2d 727 (Pa. Super. Ct. 1982) (holding plaintiff could not sustain cause of action for concerted tortious conduct where evidence did not establish which student made "a dare" to knock trash can off balcony).  Once again, none of these cases contemplate a similar fraudulent claim from Fulton's case.

Fulton correctly asserts that Miller v. Santilli does appear to say that an aiding and abetting claim exists under Pennsylvania law.  2007 Phila. Ct. Com. Pl. LEXIS 252, 19-20 (Pa. C.P. 2007).  However, the Miller court's adamant retort to Defendants that such a claim exists is not supported by any reference other than the Restatement itself.  Id.  Because this is an unsettled question of law, I will not bind itself to the holding of Miller or S. Kane & Son.  Accordingly, I find that an aiding and abetting fraud claim may exist under Pennsylvania law, and thus will not dismiss the claims under this rationale.

[29] Aiding and abetting is also known as concerted tortious conduct.  Sovereign Bank v. Ganter, 2006 PA Super 338, P17 (Pa. Super. Ct. 2006).

[30] What constitutes "substantial assistance and encouragement" has not been specifically defined by Pennsylvania courts in this context.  The Restatement of Torts § 876, Comment b suggests that in determining if the assistance is substantial enough to make an individual liable for the acts of another, the relevant factors are: (1) the amount of assistance given by the defendant (2) his presence or absence at the time of the tort; (3) his relation to the other person; and (4) his state of mind.  Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 163 (3d Cir.1973), cert. denied, 416 U.S. 960 (1974).  Additionally, the language "[i]f the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act" has been interpreted to mean that the aid must "proximately cause the violation."  Krasny v. Bagga (In

Comment (c) to this section states that "it is essential that the conduct of the actor be in itself tortious."  Thus, "an aider and abettor must willfully and knowingly associate himself with another's unlawful act."  <u>Failla</u>, 146 F.3d at 158.  Additionally, Plaintiff must comport with heightened pleading standards in 9(b), which states "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

The complaint alleges that UBS had sufficient knowledge concerning the market conditions, the auction and how the interest rates and securities values were set based on the bidding process.  Compl. ¶ 35.  Additionally, UBS knew that NatCity and PNC participated as brokers in the auction and it paid commissions to brokers for participation and sales.  Compl. ¶ 30.  However, there is no factual allegation from which one can conclude that UBS knew of PNC and NatCity's alleged wrongdoing.[31]  Fulton has not alleged facts that suggest UBS was aware the NatCity and PNC breached a fiduciary duty to Fulton in recommending securities.  UBS did not have any contact with Fulton and UBS did not commit any independent breach of duty owed to Fulton.  Thus, any assistance rendered by defendants was indirect.  This activity does not rise to the level of aiding and abetting because there is no allegation that UBS knew that PNC or NatCity was perpetuating a "fraud" on Fulton.  Merely running an auction at the request of issuers

---

re Jamuna Real Estate, LLC), 416 B.R. 412, 437 (Bankr. E.D. Pa. 2009) (quoting <u>Aetna Cas. and Sur. Co. v. Leahey Constr., Co.</u>, 219 F.3d 519, 537 (6th Cir. 2000)).

[31] It is also problematic for the Plaintiffs that "the person who is primarily liable must have violated a securities law, and the alleged aider and abettor must have known of this violation and by his conduct substantially assisted the primary violator in carrying out the unlawful scheme."  <u>Kievit v. Rokeach</u>, 1987 U.S. Dist. LEXIS 16131 (D.N.J. Oct. 29, 1987) (citing <u>Rochez Bros., Inc. v. Rhoades</u>, 527 F.2d 880, 886 (3d Cir. 1975)).

and paying commissions to brokers does not rise to substantial assistance or encouragement of the specific fraud Fulton is alleging PNC and NatCity committed.

## G.    Equitable Rescission

Finally, defendant argues that plaintiff's claim for equitable rescission must be dismissed because it is a remedy for fraud and not a separate cause of action.[32]  I agree. See  Enter., Inc. v. Borden, 807 F.2d 1169, 1174 (3d Cir. 1986) (quoting Scaife v. Rockwell-Standard Corp., 285 A.2d 451 (1971), cert denied, 407 U.S. 920 (1972) ("A defrauded party may pursue several remedies including . . . rescission . . . based on fraud.")); Prof'l Sys. Corp. v. OPEX Postal Techs., 2006 U.S. Dist. LEXIS 9487, 16-17 (E.D. Pa. Mar. 8, 2006) (holding equitable rescission is a remedy for fraud, not a cause of action); Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138 (Pa. Super. Ct. 1985); and Majer, 541 F. Supp. 2d at 713.  However, if a plaintiff alleges fraud in a transaction, a right of rescission is established. [33]  Baker v. Cambridge Chase, Inc., 725 A.2d 757 (Pa. Super. Ct. 1999).  Even if Fulton had properly pled rescission as a remedy for its fraud claim instead of as a separate cause of action, it must also be dismissed for the reasons stated above regarding the deficiencies in Fulton's fraud claim.

## III.    Conclusion

---

[32] Fulton cites Gilmore v. Northeast Dodge Co., Inc., as support for its claim that equitable rescission is a cause of action and not simply a remedy.  420 A.2d 504, 506 (Pa. Super. Ct 1980).  Upon closer reading of the case, it is clear that equitable rescission may be imposed as a remedy if the purchaser was induced to enter a contract by material misrepresentation.  The case also states that equitable rescission is a remedy for a contract, yet the facts fail to plead that UBS and Fulton ever entered into a contract.  Fulton merely entered into an agreement with its brokers, PNC and NatCity.

[33] The purpose of equitable rescission is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction.  Gilmore v. Northeast Dodge Co., Inc., 420 A.2d 504 (Pa. Super. Ct. 1980).

In regard to Counts I through III of the complaint, Fulton has failed to plead sufficient facts regarding their duty of disclosure allegations, given their relationship with UBS and in light of the disclosures that were made by UBS.  Additionally, Fulton has been unable to sufficiently allege those elements of a private cause of action not required in regulatory proceedings, such as scienter, reliance, and loss causation.

As to plaintiff's common law claims, I recommend finding that Fulton cannot maintain a claim for negligent misrepresentation, breach of fiduciary duty, common law fraud, aiding and abetting common law fraud, or equitable rescission.  Fulton has failed to show that UBS was under any affirmative duty to disclose the information regarding ARS auction practices, which undermines many of these claims.  Additionally, equitable rescission is a remedy not a viable cause of action.  For the reasons stated above, I will grant defendant's motion to dismiss.

An appropriate order follows.